AMY P. KNIGHT, ESQ.
CA Bar No. 286100
Phillips Black, Inc.
1714 Franklin St #100-806
Oakland, CA 95612
Tel: (520) 878-8849
a.knight@phillipsblack.org
*Pro hac vice* Pending

Attorney for Movant Eric Lyle Williams

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIC LYLE WILLIAMS,<br>　　　　Movant,<br><br>v.<br><br>NBC UNIVERSAL MEDIA LLC,<br>　　　　Respondent. | Case No. 25-mc-122<br><br>Underlying Litigation:<br>Williams v. Guerrero<br>Case No. 3:20-cv-3030-N<br>United States Direct Court<br>Northern District of Texas<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL COMPLIANCE WITH THE SUBPOENA ISSUED TO NBC UNIVERSAL** |

## TABLE OF CONTENTS

I.  BACKGROUND ...................................................................................................................2

    A.  The Underlying Case ..............................................................................................3
    B.  The *Dateline* Episodes ...........................................................................................5
    C.  Discovery Practice ..................................................................................................5

II. ARGUMENT .......................................................................................................................7

    A.  Law Governing the Journalist's Privilege ..............................................................7
    B.  The Materials Sought are Not Entitled to Protection .............................................8
        1.  Relevance ...................................................................................................10
        2.  Availability .................................................................................................15
    C.  The Subpoena Imposes No Undue Burden ...........................................................16

III. CONCLUSION ..................................................................................................................18

### I. BACKGROUND

This motion seeks to enforce a subpoena issued by a court in the Northern District of Texas in federal habeas corpus proceedings in a death penalty case. The subject of the federal habeas corpus litigation, broadly speaking, is the conduct of the criminal investigation and trial that gave rise to Eric Williams's conviction and death sentence (rather than primarily being about the facts of the underlying case). Neither side is represented by the attorneys or law offices involved in the 2014 trial. NBC Universal ("NBC") conducted on-camera interviews with various witnesses important to the State of Texas's securing and defending Mr. Williams's death sentence, which he alleges was obtained in violation of the U.S. Constitution. The interviews included the two lead prosecutors and lead defense lawyer, four critical law enforcement officers, Mr. Williams's ex-wife and co-defendant who testified against him, and several trial

witnesses. In the aired footage, they all specifically discussed the investigation and trial of Mr. Williams, resulting in the conviction he is now challenging in the underlying proceeding. Their interviews are directly relevant to various claims asserted in Mr. Williams's habeas petition.

**A. The Underlying Case**

The case is complex. Briefly, Mr. Williams was an attorney in small Kaufman County, Texas (outside of Dallas), and served as an elected Justice of the Peace. In what he believed was a politically motivated prosecution, the local District Attorney Mike McLelland—whose campaign Williams had opposed—brought charges against him for stealing three computer monitors from the County (Mr. Williams insisted he was using them only for official purposes) and personally tried him for this crime, alongside Deputy District Attorney Mark Hasse. In March of 2012, Mr. Williams was convicted, and while he did not do jail time, he was stripped of his judgeship and his law license.

Mark Hasse was killed on January 31, 2013, and despite a massive multi-agency manhunt, the killer was not caught. Mike McLelland and his wife Cynthia were killed on March 30, 2013. Mr. Williams was arrested April 12, 2013, and his wife Kim was arrested five days later. Both were indicted for capital murder on June 27, 2013. Kim pled guilty and agreed to testify against Mr. Williams. The State took him to trial in 2014 on the murders of the McLellands, and brought in evidence of the murder of Mark Hasse only during the penalty phase, and Mr. Williams was sentenced to death. Not surprisingly given the nature of the charges, the trial was covered extensively in the media.

Following the conclusion of state court review of the conviction and sentence in 2020, Mr. Williams filed the instant federal petition for habeas corpus under 28 U.S.C. § 2254, raising thirteen federal constitutional claims for relief. *See* Declaration of Amy Knight ("Knight Dec") Exhibit A. The claims include:

- Claim Two: The State violated Williams's due process rights under Brady v. Maryland when it produced over 25 terabytes of discovery in a disorganized, unsearchable, inaccessible format.

- Claim Four: In failing to disclose evidence of a third-party perpetrator, both at trial and in state habeas proceedings, the State violated Williams's rights to due process.

- Claim Five: Williams's due process rights were violated when a disqualified prosecutor actively worked for the prosecution.

- Claim Six: Williams's trial counsel were ineffective at the culpability phase of his trial.

- Claim Seven: Trial counsel provided constitutionally ineffective assistance in the preparation and presentation of the penalty phase of Williams's trial.

- Claim Nine: The State violated Williams's due process rights under Brady by failing to disclose material impeachment evidence pertaining to a key state penalty phase witness.

- Claim Ten: The State's reliance on flawed forensic evidence at both phases of trial violated Williams's rights to due process and a reliable sentencing verdict under the Fifth, Fourteenth and Eighth amendments.

- Claim Thirteen: The cumulative prejudicial effect of the errors at both phases described herein denied Williams his rights under the Sixth, Eighth, and Fourteenth Amendments.

Claims Two, Four, Five, and Nine address the conduct of the trial prosecutors. Claims Six and Seven (addressing ineffective assistance at trial) each contain multiple sub-parts concerning the performance of the court-appointed defense attorneys. The witness at issue in the *Brady* violation alleged in Claim Nine is the Petitioner's ex-wife and codefendant, Kim Williams.

In addition to the pervasive news coverage, after the trial ended, multiple producers created "true crime"-type programming about the case, including NBC, which aired an episode

of *Dateline* about the case entitled "Vendetta" in 2015, and an updated episode entitled "Bad Intentions" with additional interview footage in 2023.

### B.  The *Dateline* Episodes

The 2015 *Dateline* episode "Vendetta" included footage from interviews with fifteen people who were involved in the investigation and trial. The 2023 episode "Bad Intentions" re-aired the 2015 material and added footage from an additional newly conducted interview with Mr. Williams's co-defendant and ex-wife Kim Williams. Those interviewed included both the lead defense lawyer Matthew Seymour and the two lead prosecutors, Bill Wirskye and Toby Shook. They also included five law enforcement officers who were instrumental in the multi-agency investigation: Sheriff David Byrnes and Lt. Jolie Stewart of the Kaufman County Sheriff's Office, Eric Kasper of the Texas Rangers, and Michael Hillman and Laurie Gibbs of the FBI. In addition, there were interviews of two trial witnesses: Officer Jason Stastny of the Kaufman Police Department and C.J. Tomlinson. Also interviewed were friends and family of the victims Christina Foreman, Marcus Busch, and Leah Phillips, local reporter Ken Kalthoff, another prosecutor in the office where two victims worked both at the time of the killings and during the trial, Shannon Hebert, and Tera Bellemare, Mr. Williams's sister. Mr. Williams now seeks to enforce the subpoena as to Seymour, Wirskye, Shook, Hebert, Byrnes, Stewart, Kasper, Hillman, Gibbs, and Kim Williams. *See* Knight Dec ¶ 12 and Exhibit K.

### C.  Discovery Practice

Because this is a habeas corpus proceeding and not an ordinary civil case, it is governed not only by the Federal Rules of Civil Procedure, but also by the Rules Governing § 2254 Proceedings. Federal Rule of Civil Procedure 26(b) provides that in appropriate cases, a party may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense." Under Rule 6 of the Rules Governing § 2254 Proceedings, however, a habeas

petitioner is entitled to conduct discovery on a showing of "good cause." A petitioner establishes "good cause" when "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).

Accordingly, after reviewing the aired episodes of television programs identified above, counsel for Mr. Williams moved the Court in the habeas matter for leave to serve subpoenas on two networks, Warner Brothers[1] and NBC, seeking footage of their interviews with participants in the investigation and trial that did not make it into the aired episodes. *See* Knight Dec Exhibit B. The State opposed the motion, arguing that Mr. Williams had not established "good cause" for discovery in connection with any of the claims in his Petition. Knight Dec Exhibit C. The Court, over the State's objection, authorized the subpoenas, ruling that "Williams has alleged facts which make a rational case for his belief that relevant and material information may be in the possession of the media organizations in question and within the personal knowledge of the individuals interviewed and recorded by the media organizations." Knight Dec Exhibit D.

Williams then served on NBC, on November 15, 2023, a subpoena seeking materials from both *Dateline* and programming aired on the Oxygen Network.[2] Knight Dec Exhibit E. As to *Dateline*, the subpoena was for "All footage of interviews recorded in the production of Dateline episodes 'Vendetta' (Season 23, Episode 22) and 'Bad Intentions' (Season 31, Episode 4), including those that were not included in the final episode, complete and unedited, and any

---

[1] Warner Brothers is headquartered in Los Angeles, and that subpoena is thus not at issue before this Court.
[2] Oxygen responded separately and averred it had no responsive materials. Knight Dec Exhibit H. Accordingly, the Oxygen materials are not addressed in this motion.

existing transcripts of those interviews, including but not limited to interviews with" sixteen individuals who appeared on camera in the two aired episodes.

After Mr. Williams agreed to an extension to January 15, NBC responded with a letter of objection, asserting both a journalist's privilege and undue burden. Knight Dec Exhibit F. Mr. Williams responded further, explaining why compliance was still required. Knight Dec Exhibit G. NBC did not produce any materials.

After a delay occasioned by proceedings in the underlying matter,[3] Mr. Williams then inquired of counsel by phone if NBC would comply if the subpoena were narrowed to only the co-defendant, attorneys and investigative personnel. NBC still declined, produced no materials, and filed no motions. At this juncture, Mr. Williams seeks enforcement of the subpoena only as to the co-defendant, law enforcement officers, and attorneys, and has agreed not to seek enforcement as to the friends and family or local reporter.

**II. ARGUMENT**

As an initial matter, the Court should grant this motion to compel because NBC never moved to quash the subpoena, even after Mr. Williams responded to its objections explaining why he believed the privilege did not apply. But even if it had properly sought to quash the subpoena, it would have been unsuccessful.

### A. Law Governing the Journalist's Privilege

NBC invokes an opinion from the Second Circuit in which NBC itself was, as here, a non-party served with a subpoena for footage from out-of-district litigation: *Gonzales v. National Broadcasting Co., Inc.,* 194 F.3d 29 (2d Cir. 1999). The underlying action in *Gonzales* was a

---

[3] This is a criminal case with counsel appointed in the Northern District of Texas under the Criminal Justice Act. The delay was largely consumed with attempting to locate pro bono counsel or secure the appointment of additional counsel who could litigate subpoena compliance at minimal cost to the federal courts.

civil rights lawsuit alleging racial profiling and unlawful detention based on a traffic stop in Louisiana. *Id.* at 31. The footage sought was not about the *Gonzales* case itself, but rather was from a separate investigation by *Dateline* of the same subject (unwarranted stops of motorists in Louisiana), and consisted not of interviews, but of recordings from hidden cameras a producer had placed in a rented car, capturing the same deputy conducting an allegedly unjustified traffic stop on the producer.

The *Gonzales* Court clarified that while a qualified privilege "protecting press materials from disclosures applies to nonconfidential as well as to confidential materials," the showing required to overcome that privilege is "less demanding" than that required for confidential materials. *Id.* at 32. The standard ultimately articulated in *Gonzales* was on its face limited to civil cases: "Where a civil litigant seeks nonconfidential materials from a nonparty press entity, the litigant is entitled to the requested discovery notwithstanding a valid assertion of the journalists' privilege if he can show that the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." *Id.* at 36. In a later case, the Second Circuit held, "in instances where a reporter is not protecting a confidential source or confidential materials, the showing required to overcome the journalist's privilege is the same in a criminal case as it is in a civil case—namely, the showing required by *Gonzales*—and that this is true whether the party seeking to overcome the privilege is the prosecution or the defense." *U.S. v. Treacy,* 639 F3d 32, 42 (2d Cir. 2011). The Second Circuit has also made it unmistakably clear that "the burden is on the person who claims the privilege to show entitlement." *Chevon Crop. v. Berlinger,* 629 F.3d 297, 309 (2d Cir. 2011).

### B. The Materials Sought are Not Entitled to Protection

There is no contention here that the materials sought are confidential. Moreover, the material sought here is not the type of investigative work product for which the qualified

8

journalistic privilege was originally created. In an early opinion discussing the need for a journalistic privilege, the Second Circuit was concerned about "[t]he deterrent effect such disclosure is likely to have upon future 'undercover' investigative reporting." *Baker v. F and F Inv.*, 470 F2d 778, 782 (2d Cir. 1972) (protecting source for article exposing racially discriminatory real estate practices). The Second Circuit has explained that to be entitled to the protection, "the person must have acted in the role we identified in *Baker, von Bulow,* and *Gonzales* as that favored by the public interest that motivates that privilege—the role of the *independent* press." *Chevron Corp. v. Berlinger,* 629 F.3d 297, 307 (2d Cir. 2011).

The project undertaken by *Dateline* here was not a novel investigation involving undercover reporting or exposing some sort of danger to the public; it was primarily providing behind-the-scenes details for entertainment purposes of a trial that had received extensive news coverage while it occurred. It is thus entirely unlike, for instance, the investigation at issue in *Gonzales,* where the show's producers were gathering new information about the practices of Louisiana law enforcement officers through their own observations, and then reporting on it. *See also In re Application to Quash Subpoena to Nat. Broadcasting Co., Inc.,* 79 F.3d 346, 348 (2d Cir. 1996) (discussing a *Dateline* "report about infant deaths that occurred in Graco Converta-Cradles" that "concluded with an admonition to 'keep an eye out for cradles that may have slipped by the 1992 recall'"); *Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 757 F.3d 1125 (10th Cir. 2014) (*Dateline* episode "exposing fraud in annuity sales to senior citizens" including surreptitiously filmed footage of seminar). This is not to say the *Dateline* episodes at issue here are entitled to no protection, but the interests at stake for the producers here are less weighty than in more traditional journalistic endeavors.

9

Moreover, while a habeas corpus proceeding is technically civil, a petition under 28 U.S.C. § 2254, a federal collateral challenge to a state-court conviction, is inextricably linked with a criminal prosecution, and a habeas petitioner in this context is by definition a criminal defendant seeking to defend himself. Thus, it implicates "the needs of criminal defendants in putting on a defense." *Gonzales,* 194 F.3d at 34 n.3. It is difficult to imagine a situation where those needs are weightier than where a sentence of death has been imposed.

But even in a civil case where only money was at stake, the *Gonzales* Court ruled that NBC must produce tapes because they "might help determine whether [the deputy] engaged in a pattern or practice of stopping vehicles without probable cause," and because the tapes "can provide unimpeachably objective evidence of [the deputy's] conduct." *Id.* at 36. That is not a high standard. Nor is it necessary to specify precisely what is in the materials sought. *See In re Application of Chevron Corp.*, 709 F. Supp. 2d 283, 297 (S.D.N.Y. 2010), *as corrected* (May 10, 2010), *aff'd sub nom. Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011) ("[R]espondents' assertion that the applications are insufficiently particular is unavailing. . . . Respondents . . have refused to provide any information whatsoever as to the content of the outtakes. Petitioners cannot reasonably be expected to identify with particularity the outtakes that they seek where knowledge of their content lies exclusively with Berlinger").

1. <u>Relevance</u>

Here, the Court in the underlying litigation, which is familiar with the details of the case, has already found good cause for issuance of this specific subpoena in the context of his habeas petition and the claims it asserts. Rule 6 of the Rules Governing § 2254 cases requires petitioners to specify exactly what they want to request when obtaining leave of the court, which the commentary accompanying the rule explains serves "to advise the judge of the necessity for discovery and enable him to make certain that the inquiry is relevant and appropriately narrow."

10

Where a habeas petitioner has not articulated a request for material that sufficiently bears on his claims, courts, including courts in the Fifth Circuit where this action arises, can and do deny discovery. *See, e.g., Harris v. Johnson,* 81 F.3d 535, 540 (5th Cir. 1996) ("Rule 6 of the Federal Rules Governing Section 2254 Cases does not, however, authorize fishing expeditions. A habeas petitioner must make sufficiently specific factual allegations."). If this were the fishing expedition NBC claims it is, the Court in the underlying action never would have authorized the subpoenas to begin with.

And indeed, the interviews are plainly relevant to the claims asserted in this litigation. First, there is no dispute that the requested footage pertains to the murder investigation and trial that are the subject of the pending habeas petition. That alone makes it relevant to the claims in the habeas petition, several of which address the entire conduct of the investigation and trial, as it is not "necessary to specify precisely what is in the materials sought." *See Chevron Corp.*, 709 F. Supp. 2d at 297. In contrast, this Court has found materials not sufficiently relevant to overcome the qualified privilege where, for instance, they address a party's conduct specifically in the underlying litigation, rather than the events that are the subject of that litigation. *See Breaking Media, Inc., v. Jowers,* 2021 WL 1299108 (S.D.N.Y., April 7, 2021). And a litigant can still overcome the qualified privilege where "not everything" a subject said in the materials "is relevant to the underlying litigation," because "the standard for relevance to overcome the journalist's privilege for non-confidential materials is low." *Marshall Project, Inc. v. City of Cleveland,* 2024 WL 4589667 (S.D.N.Y. Oct. 28, 2024).

**Attorneys**: Three of the interviews are with prosecutors, two private lawyers (Bill Wirskye and Toby Shook[4]) who were appointed as special prosecutors for this trial, and a third (Shannon

---

[4] Wirskye and Shook appear to have been interviewed together.

11

Hebert) who worked in the Kaufman County District Attorney's Office both during the killings and during the trial. A fourth is with the defense attorney, Matthew Seymour. Wirskye and Shook were responsible for prosecuting the case, from before the McLelland murders were even committed, and thus were in charge of the information collected and generated throughout the case, including making required disclosures to the defense. They were also responsible for assessing and presenting the evidence at trial, including the forensics.

Claims Two, Four, and Nine all allege violations of *Brady v. Maryland,* 373 U.S. 83 (1963), Claim Two as to how the massive amount of information associated with this investigation was provided to the defense, Claim Four as to a specific piece of information about a car captured on video, and Claim Nine as to statements by key witness Kim Williams. In the aired footage, Wirskye talks in detail about how the data-heavy portions of the investigation unfolded, including the many tips received and the collection of hours upon hours of surveillance video—which would have included video, ultimately processed and reviewed by the FBI, that gave rise to Claim Four. The massive information generated by the investigation of these many tips and the collection of so much video makes up a significant portion of the data that caused the problem at issue in Claim Two. Claim Nine alleges improperly withheld information about co-defendant and key witness Kim Williams. Wirskye and Shook both discussed their use of Kim Williams as a witness in their aired footage.

Claim Five alleges that although the Kaufman County DA's office was disqualified from the case (which is why Wirskye and Shook were appointed), a prosecutor from that office (Sue Korioth) remained intimately involved in the preparation of the case. Shannon Hebert worked in that office during the alleged events. Though she did not, in the aired footage, discuss the actions of her colleagues in the office in preparation for the trial, she did discuss at length the personal

experience of the prosecutors in that office during the events at issue (at times referring to "all of us," feelings of "our whole office," and noting "we all felt that") which is the crux of the argument that the impermissible participation of that office via Korioth prejudiced Mr. Williams.

Wirskye also continued to participate as a prosecutor in the state habeas proceedings, where he was also a testifying witness (Knight Dec Exhibit J), causing Mr. Williams to file two (unsuccessful) motions to disqualify him. Knight Dec Exhibit I. Those motions asserted that his participation in the state habeas proceedings itself was unconstitutional, an allegation which, if proven, would reveal the state court process to be unreliable and unworthy of the deference it will otherwise be accorded in the instant federal habeas proceedings. His statements are relevant to establishing the complete picture of his level of emotional involvement in the case, which bears on the reliability of the state habeas proceedings generally, and is thus broadly relevant to the procedural restrictions governing the federal habeas proceeding.

Matthew Seymour, the lead defense lawyer, is the primary subject of Claims Six and Seven, which allege ineffective assistance of counsel. Only a brief except from Seymour's interview appears in the aired footage, but in it, he makes statements about what the defense strategy was. Whether various actions were an intentional part of a reasonable strategy is the critical question for establishing a claim of ineffective assistance. In light of these claims, these lawyers' interviews, in which they discuss this investigation and trial, are sufficiently relevant to the underlying litigation to overcome the qualified privilege.

**Investigators**: Jolie Stewart (Kaufman County Sheriff's Office), Eric Kasper (Texas Rangers), Michael Hillman (FBI), and Laurie Gibbs (FBI) were investigative personnel closely involved in the case. As discussed above, Claim Four addresses the FBI identifying a different car—not associated with Mr. Williams—as the car involved in the Hasse shooting. In her aired

footage, Stewart explicitly discusses "how many silver or light-colored four-door sedans there are." While Hillman and Gibbs[5] do not directly address the car on camera, Hillman does discuss the FBI's significant involvement in the case, which is known to include attempting to identify the car used in the Hasse murder, in which the alleged *Brady* violation occurred. He also discusses the scale and scope of the investigation, which bears on the volume and organization of information at issue in Claim Two. Hillman also discusses the handling of Kim Williams. Kasper, in the aired footage, primarily discusses the McLelland crime scene, and the search of Mr. Williams's storage unit after he was identified as a key suspect. These topics bear on Claim Ten in Mr. Williams's petition, which asserts flaws in the State's forensic evidence, including fingerprints and ballistics/firearms evidence from the very areas Kasper is discussing.

**Co-defendant**: Perhaps the most obviously relevant footage is the Kim Williams interview recorded for the 2023 episode. Kim testified in the penalty phase of the 2014 trial and gave a detailed account of her participation in both murders, yet the aired footage begins with Kim saying she "think[s] it's probably time to go ahead and tell [her] side of the story." She also says the prosecutors told her not to cry. When asked about her trial testimony, she says, "I know what I said. And that was a mistake, and that's not true, because I live with it every day." Thus, she was clearly discussing both how the prosecutors prepared her for her testimony and the truth or falsity of what she said on the stand that was used to secure Mr. Williams's death sentence. It is hard to imagine an interview more relevant to the claim that the State failed to disclose material evidence regarding Kim Williams.

---

[5] Hillman and Gibbs appear to have been interviewed together.

2. <u>Availability</u>

First, unlike any of the Second Circuit opinions involving civil or even trial-level criminal proceedings, in this habeas corpus proceeding, Mr. Williams is not generally entitled to discovery. He cannot simply serve subpoenas on all of the interview subjects demanding depositions. Indeed, in cases in which the Second Circuit has ruled the material was reasonably available from other sources, often the parties had actually deposed the very person whose interview footage they sought already and simply failed to ask about the relevant topics. *See, e.g., In re Application to Quash Subpoena to Nat. Broadcasting Co., Inc.,* 79 F.3d 346, 349 (2d Cir. 1996) ("In any event, Graco had the opportunity to elicit this information at Ms. Marden's deposition and the out-takes, if any there were in this regard, were therefore not critical or necessary to the defense."). Despite being under the most severe sentence possible under the law, Mr. Williams does not have that luxury. Moreover, he is an indigent criminal defendant, represented by court-appointed counsel under the Criminal Justice Act. Conducting nine depositions (all also of non-parties) is simply impracticable.

But even if he could simply subpoena these people for depositions, that would not provide the same evidence as the interview footage. In *Treacy,* the Second Circuit recognized that it's not just raw information that can be relevant in media-gathered materials. In that case, a *Wall Street Journal* reporter was called to testify about his conversations with a criminal defendant and the Court explained that "false exculpatory statements can provide circumstantial evidence of guilt, and this satisfies the *Gonzales* 'likely relevance' test." *Treacy,* 639 F.3d at 43. In other words, the fact that he said it was relevant, independent of its truth. Similarly, in *Gonzales* itself, the Court recognized the value of video footage as "unimpeachably objective evidence of [the deputy's] conduct," *Gonzales,* 194 F.3d at 36—even though the plaintiffs had access to the deputy himself and could question him about his actions. *See also U.S. v.*

*Cutherbertson,* 630 F.2d 139, 148 (3d Cir. 1980) (recorded interview statements "are unique bits of evidence that are frozen at a particular place and time. Even if the defendants attempted to interview all of the government witnesses and the witnesses cooperated with them, the defendants would not obtain the particular statements that may be useful for impeachment purposes at trial.").

Federal habeas corpus review encompasses a review of the prior state-court habeas proceedings to ensure that they comported with federal law. 28 U.S.C. § 2254(d). The record on which this determination is based is primarily the record developed in state proceedings, unless a previously unavailable factual predicate arises. 28 U.S.C. § 2254(e)(2); *Shinn v. Ramirez,* 596 U.S. 366, 382 (2022). If a witness makes statements inconsistent with their testimony for the first time after the state proceedings (including state habeas review) have ended, the presumption of correctness of state court factual determinations that generally binds federal habeas petitioners (*see* 28 U.S.C. § 2254(e)(1)) can be called into question, both because of new substantive information and if the credibility of a witness from the prior proceedings has been undermined. Thus, any statements by witnesses may be relevant not just for what they say, but for their relationship to the statements already in the record.

### C. The Subpoena Imposes No Undue Burden

NBC also asserted compliance would be an undue burden. NBC bears the burden of establishing any undue burden. *United States v. Int'l Bus. Mach. Corop.,* 83 F.R.D. 97, 104 (S.D.N.Y. 1979). In its letter, NBC represented that the request encompasses approximately 20 hours of video. Notably, while this does encompass two aired episodes, NBC has confirmed that the second episode included just one additional interview; the remainder of the footage was shot for the first episode. Moreover, Mr. Williams is voluntarily withdrawing the request for video from five of the interviewees. In addition, there are two interviews that include two subjects in

the same interview (Wirskye and Shook; Hillman and Gibbs), cutting down on the total amount of footage requested.

Additionally, although counsel for NBC indicated it would be necessary to retrieve the material from archives, it appears NBC recently did just that for its own purposes. Approximately 11 months after the subpoena was originally served, NBC released yet a third television episode using the footage from these interviews, for its brand-new "The Smoking Gun" *Dateline* spinoff,[6] of which the second episode, aired October 10, 2024, was once again about Mr. Williams's case, using primarily the same footage included in the prior two episodes.

Whether a subpoena imposes an undue burden depends on "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Hughes v. Twenty-First Century Fox, Inc.*, 327 F.R.D. 55, 57 (S.D.N.Y. 2018) (quoting *U.S. v. Int'l Bus. Mach. Corp.*, 83 F.R.D. 97, 104 (S.D.N.Y. 1979)). Relevance and need are discussed above and are already established in overcoming the qualified journalist's privilege.

The request here is not broad. It is limited to one set of interviews, filmed for one interrelated set of programs, totaling, in NBC's estimation, less than 20 hours (before excising the friends and family interviews Mr. Williams now agrees to withdraw), and Mr. Williams has identified exactly the interviews he is looking for. This Court has recently found, for example, there was no undue burden on non-party Microchip Technology in producing technical documents and sales data relating to 15 distinct LED drivers covering a six-year period, as the

---

[6] *See* https://www.oxygen.com/dateline-the-smoking-gun/crime-news/andrea-canning-to-host-oxygen-show-dateline-the-smoking-gun (last visited February 28, 2025) (announcement of series premiering on October 3, 2024 with "Vendetta" episode to air October 10).

request was limited to the drivers and time period that might be relevant. *Samsung Elecs. Co. v. Microchip Tech. Inc.*, 347 F.R.D. 252, 261 (S.D.N.Y. 2024).

As to the burden itself, counsel for Mr. Williams inquired as to the nature of the burden, and NBC's counsel stated it would have to retrieve and watch the requested footage, which NBC's counsel had not seen. "[T]he mere assertion that tracking down information and documents will be more difficult is not enough to show that the burden is undue," and such an assertion "without evidence to prove the claim, cannot form the basis for an 'undue burden' finding." *Samsung Elecs. Co. v. Microchip Tech. Inc.*, 347 F.R.D. 252, 261 (S.D.N.Y. 2024) (citation omitted). Given NBC's own voluntary recycling of this same footage within the last six months, it seems likely NBC is expending more resources resisting this subpoena than it would in complying. But regardless, somewhere less than 20 hours of video could not create the kind of burden courts have found to be undue. *Cf. Cuomo v. New York State Assembly Judiciary Committee,* 683 F.Supp.3d 258, 279-80 (E.D.N.Y. 2023) (review of approximately 73,000 documents creates undue burden on government office). Moreover, "the burden of production must be compared with the size of and resources available to the responding party." *International Business Machines,* 83 F.R.D. at 108-09 (noting "while the inconvenience to be imposed by the Cary subpoena may be substantial on an absolute scale, when compared with IBM's size and resources it is neither unduly burdensome nor oppressive.").

### III.  CONCLUSION

For the foregoing reasons, Mr. Williams respectfully requests that the Court order NBC to produce materials responsive to the third-party subpoena as outlined above.

Dated: March 24, 2025                                      Respectfully submitted,

                                                                                    /s/ Amy Knight

Amy Knight
PHILLIPS BLACK, INC.
1714 Franklin St #100-806
Oakland, CA 95612
Tel: (520) 878-8849
a.knight@phillipsblack.org

*Attorney for Movant Eric Lyle Williams*