UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__8/25/2025__
```

-------------------------------------------------------------------X
:
ERIC LYLE WILLIAMS,                                                :
:
                              Movant,                              :
:
                                                                   :            25-mc-00122 (LJL)
              -v-                                                  :
:            OPINION AND ORDER
NBC UNIVERSAL MEDIA LLC,                                           :
:
                              Respondent.                          :
:
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Eric Lyle Williams ("Williams"), who is facing a death sentence imposed by the state of

Texas, moves for an order compelling third party NBC Universal Media, LLC ("NBCU") to

produce materials responsive to a subpoena issued by Williams (the "Subpoena") with

authorization from the United States District Court of the Northern District of Texas.  Dkt. No. 1.

      For the reasons that follow, the motion to compel is granted in part and denied in part.

## BACKGROUND

### I.  Williams's Conviction, Sentence, and Section 2254 Petition

      Williams is an inmate on death row.  He was convicted in Texas state court of capital

murder in December 2014 and sentenced to death.

      Williams's conviction and sentence stem from the shooting death of Michael McLelland,

the District Attorney of Kaufman County, Texas, and his wife Cynthia McLelland.  Williams, an

attorney, was elected Justice of the Peace in Kaufman County, Texas, taking office in January

2011.  *See Williams v. State*, 2017 WL 4946865, at *3 (Tex. Crim. App. Nov. 1, 2017).  In

March 2022, he was successfully prosecuted by McLelland for a felony offense of theft and

burglary, resulting in the loss of his elected office, the suspension of his law license, the loss of

his law practice, and his discharge from his position with the Texas State Guard. *Id.* On March 30, 2013—the day before Easter Sunday—Michael McLelland and his wife were shot and killed. *Id.* at *2.

Williams was arrested on April 12, 2013, was indicted for capital murder on June 27, 2013, and was tried in 2014. Dkt. No. 2 at 3. The two lead prosecutors at trial were Bill Wirskye and Toby Shook. *Id.* at 5. Williams's lead defense attorney was Matthew Seymour. Dkt. No. 2 at 3. The witnesses against Williams included Officer Jason Stastny of the Kaufman Police Department and C.J. Tomlinson, a family friend of the McLellands who discovered their bodies. *Id.* Williams's wife, Kimberly Williams ("Kim Williams"), was also arrested and indicted for the capital murder but pled guilty and testified against Williams. *Id.* at 3. Williams was eventually convicted of the murder of Cynitha McLelland. During the penalty phase of Williams's trial, the State presented evidence that the assistant district attorney who helped prosecute Williams, Mark Hasse, was shot and killed on January 31, 2013, a few months before Cynthia McLelland was killed. The State ascribed the murder to Williams. *See Williams v. State*, 2017 WL 4946865, at *6. [1] Kim Williams testified against Williams at the penalty phase. *Id.*; Dkt. No. 3-1 at 30–31. Williams was sentenced to death.

Williams's conviction and sentence were affirmed by the Texas Court of Criminal Appeals. *See Williams v. State*, 2017 WL 4946865, at *46. The United States Supreme Court denied his petition for a writ of certiorari. *See Williams v. Texas*, 584 U.S. 980 (2018). The Texas Court of Criminal Appeals rejected Williams's petition for state habeas relief, affirming his conviction and sentence. The Supreme Court again denied his petition for writ of certiorari.

---

[1] Williams was indicted for the murders of Michael McLelland, Cynthia McLelland, and Mark Hasse. Once Williams received the death penalty for Cynthia's murder, the State decided not to try him separately for the murders of Michael McLelland and Mark Hasse. Dkt. No. 3-1 at 16.

*See Williams v. Texas*, 141 S. Ct. 2706 (2021).  On September 15, 2021, Williams filed a petition

under 28 U.S.C. § 2254 in the United States District Court for the Northern District of Texas

challenging both his conviction and his sentence.  *See Williams v. Director, TDCJ-CID*, Case

No. 3:20-cv-3030-N (N.D. Tex) (the "N.D. Tex. Proceeding"), Dkt. No. 59.  He filed an

Amended Petition (the "Petition") on March 14, 2022.  N.D. Tex. Proceeding Dkt. No.76; Dkt.

No. 3-1.

Williams's Petition for relief under Section 2254 raises thirteen claims, Dkt. No. 3-1,

including the following:

- Claim Two: The State violated Williams's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963)*,* when it produced over 25 terabytes of discovery in a disorganized, unsearchable, inaccessible format.  *Id.* at 48–53.

- Claim Four:  In failing to disclose evidence of a third-party perpetrator, both at trial and in state habeas proceedings, the State violated Williams's rights to due process.  *Id.* at 56–57.

- Claim Five:  Williams's due process rights were violated when a disqualified prosecutor actively worked for the prosecution.  *Id.* at 57–71.

- Claim Six:  Williams's trial counsel were ineffective at the culpability phase of his trial. *Id.* at 71–85.

- Claim Seven:  Trial counsel provided constitutionally ineffective assistance in the preparation and presentation of the penalty phase of Williams's trial.  *Id.* at 85–155.

- Claim Nine:  The State violated Williams's due process rights under *Brady* by failing to disclose material impeachment evidence pertaining to a key state penalty phase witness. *Id.* at 161–166.

- Claim Ten:  The State's reliance on flawed forensic evidence at both phases of trial violated Williams's rights to due process and a reliable sentencing verdict under the Fifth, Fourteenth, and Eighth amendments.  *Id.* at 166–174.

- Claim Thirteen:  The cumulative prejudicial effect of the errors at both phases described herein denied Williams his rights under the Sixth, Eighth, and Fourteenth Amendments. *Id.* at 179.

The witness at issue in the *Brady* violation alleged in Claim Nine is Williams's ex-wife and co-defendant, Kim Williams. *Id.* at 162.

## II.    The *Dateline* Episodes

*Dateline* is NBCU's signature newsmagazine, with episodes broadcast on television and available online. Dkt. No. 13 ¶ 2. It has been on the air since 1992 and covers a wide variety of topics in the public interest, from crime, to racism, to product safety. *Id.*

On February 27, 2015, *Dateline* broadcast an episode entitled "Vendetta," which concerned the murders of Michael and Cynthia McLelland and Mark Hasse and the ensuing investigation and prosecution of Williams. *Id.* ¶ 4. The broadcast contained interviews of the lawyers Seymour, Wirskye, and Shook and of witnesses Stastny and Tomlinson. Dkt. No. 2 at 5; Dkt. No. 3-11. It also included interviews of law enforcement officers who were instrumental in the multi-agency investigation of the murders, friends and families of the victims, a local reporter, another prosecutor who worked in the office where the two victims worked at the time of their deaths, and Williams's sister. *Id.*

"Vendetta" tells the story of the investigation of the deaths of Hasse and the McLellands and the successful prosecution of Williams. It features extensive interviews with the special prosecutors and shorter interview segments with the investigators. Dkt. No. 3-11; Dkt. No. 13 Ex. 1. [2] The interviewees describe the extent of the investigation, including the number of tips received by law enforcement, the events that led to the focus on and indictment of Williams, and the trial of Williams. *Id.*

---

[2] The "Vendetta" episode was shared with the Court as Exhibit 1 to the Declaration of Christine Fillmore, a *Dateline* NBC Producer. *See* Dkt. No. 13 ¶4. The "Bad Intentions" episode was shared as Exhibit 2 to the same declaration. *Id.* ¶ 5. A rough transcription of the interview portions of the episodes is attached to the Declaration of Amy P. Knight, counsel to Williams. *See* Dkt. No. 3-11.

On June 9, 2023, *Dateline* broadcast an episode entitled "Bad Intentions," also about the deaths of the McLellands and Hasse and the prosecution of Williams.  Dkt. No. 13 ¶ 5.  For over an hour, "Bad Intentions" largely retreads the same ground as "Vendetta."  Dkt. No. 3-11; Dkt. No. 13 Ex. 2.  In the last ten minutes of the episode, after recounting the facts of the murders, the investigation, and the guilt and penalty phases of the trial, the episode turns to an interview with Kim Williams in prison, which had not been included in "Vendetta."  *Id.*  Asked about her apparent lack of emotion on the stand, Kim Williams states that the prosecutors told her not to cry.  Dkt. No. 3-11 at 34.  The narrator of "Bad Intentions" relays that the prosecutors denied giving that instruction.  *Id.*

On the stand during the penalty phase of the Williams trial, Kim Williams testified that, after Williams killed the McLellands, she and Williams celebrated by grilling steaks, as follows:

Q: How do you and Eric spend the rest of the day, the Saturday before Easter Sunday?

A: Cooking out.

Q: Tell the members of the jury about the cookout you all had.

A: We had barbecue steaks. Well, we had steaks on the grill, and Eric cooked those.

Q: At your parents' house?

A: At my parents' house.

Q: Were you all celebrating with steaks?

A: That's correct.

Q: What was the mood like at the cookout?

A: Happy, joyous.

Q: Neither you or Eric told your parents you all had just murdered two people?

A: No.

N.D. Tex. Proceeding Dkt. No. 118-18 (Reporter's Record, Punishment Phase of Trial, Kaufman County, TX, December 16, 2014) at 68:23–69:13.

In her "Bad Intentions" interview, Kim Williams gave a different account of the incident with the steaks, after seemingly being asked about the testimony quoted above:

> Kim Williams: That was something taken out of context. My family and I always grilled steaks on Easter weekend. That was planned weeks ahead, before this.
>
> Interviewer: So you're saying the steaks were not part of a celebration—
>
> Kim Williams: No, they were not.
>
> Interviewer: —of the murders. How could you even celebrate Easter, after—
>
> Kim Williams: I didn't eat that weekend. I was so sick. But he did. And my family, had no — they had no idea what was going on.

Dkt. No. 3-11 at 35–36. The following exchange takes place shortly afterward:

> Interviewer: [Y]ou said you were both excited, happy, after these murders took place.
>
> Kim Williams: Well, I wasn't, but he was.
>
> Interviewer: But you said that. You testified to that.
>
> Kim Williams: I know what I said. And that was a mistake, and that's not true, because I live with it every day.

*Id.* at 36. Kim Williams also discusses her drug use at the time of the murders:

> Interviewer: What has that done for you, being off of all those drugs?
>
> Kim Williams: It's made me more clear-headed. My mind was very cloudy back then and I couldn't think straight, and I was pretty much a zombie.

*Id.* at 34.

## III.    The Request for Discovery and the Subpoena

On August 25, 2023, Williams's lawyers moved the United States District Court for the Northern District of Texas for an order permitting discovery related to Williams's Petition. Dkt.

No. 3-2.[3]  Counsel argued that in the years since Williams's trial, a number of television

programs had been made about his case that included original interviews with individuals central

to the case and that, because witnesses and lawyers "often speak differently about a case when it

is no longer ongoing, and are likely to be more free with information outside of a strict legal

setting," counsel needed access to the full footage of the interviews from these shows to conduct

their investigation.  Dkt. No. 3-2 at 4–5.  Among the shows from which Williams sought the

footage of interview outtakes were the two *Dateline* episodes.  *Id.* at 5–6.

  The State of Texas opposed the request for discovery, including on grounds that it

constituted an impermissible fishing expedition.  Dkt. No. 3-3.

  On November 1, 2023, the Northern District of Texas granted Williams's request for

discovery over the opposition of the State.  Dkt. No. 3-4 at 2.  The court found that Williams had

"alleged facts which make a rational case for his relief that relevant and material information

may be in the possession of the media organizations in question and within the personal

knowledge of the individuals interviewed and recorded by the media organizations."  *Id.*[4]

---

[3] In his motion before the Northern District of Texas, Williams claimed that the outtakes are
relevant to Claims Two, Four, Five, Six, Seven and Nine of the Petition.  *See* Dkt. No. 3-2 at 2.
In his motion to compel before this Court, Williams also claims that the outtakes are relevant to
Claim Ten.  *See* Dkt. No. 2 at 14.

[4] In addition to granting Williams's request for a subpoena to NBCU, the court also granted the
request for a subpoena to Warner Bros. for all footage of interviews for two different true crime
shows covering the same set of murders, Forensic Files II and 2020 Crime Watch Daily.  *See*
Dkt. No. 3-1 at 6–7.  On May 22, 2025, the United States District Court for the Central District
of California denied Williams's motion to compel Warner Bros. compliance with the subpoena.
*See In re Subpoena to Warner Brothers Entertainment, Inc.*, No. 2:25-mc-00028 (C.D. Cal.);
Dkt. Nos. 18-1, 18-2.  The Central District of California decision applied Ninth Circuit precedent
for overcoming the journalists' privilege, which requires that (1) the information sought be
"clearly relevant to an important issue in the case," meaning "a showing of actual relevance," not
"potential relevance," *Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) ("*Shoen II*"), and (2) that
"the information sought is not obtainable from another source," meaning that the requesting
party must "exhaust[] all reasonable alternative means for obtaining the information," *Shoen v.*

The Subpoena issued to NBCU seeks "[a]ll footage of interviews recorded in the production of *Dateline* episodes 'Vendetta' (Season 23, Episode 22) and 'Bad Intentions' (Season 31, Episode 4), including those that were not included in the final episode, complete and unedited, and any existing transcripts of those interviews, including but not limited to interviews with" sixteen individuals who appeared on camera in the two aired episodes. Dkt. No. 3-5 at 4.

The sixteen individuals include Kim Williams, Bill Wirskye, Toby Shook, Matthew Seymour, the law enforcement officers involved in the investigation (Sheriff David Byrnes and Lt. Jolie Stewart of the Kaufman County Sheriff's Office, Eric Kasper of the Texas Rangers, and Michael Hillman and Laurie Gibbs of the FBI) and another prosecutor in the office where the two victims worked at the time of the trial (Shannon Hebert), as well as of two trial witnesses, friends and families of the victim, and Williams's sister. *Id.*

On January 12, 2024, NBCU served Williams with objections to the Subpoena, relying in part on the 'journalists' privilege. Dkt. No. 3-6. On January 18, 2024, Williams responded to the objections. Dkt. No. 3-7.

## PROCEDURAL HISTORY

Williams filed this motion to compel on March 24, 2025. Dkt. No. 1. He also filed a memorandum of law in support of the motion and the declaration of counsel attaching a number of exhibits. Dkt. Nos. 2, 3. NBCU filed a memorandum of law in opposition to the motion and

---

*Shoen*, 5 F.3d 1289, 1296 (9th Cir. 1993) ("*Shoen I*"). The standard elaborated in *Shoen I* and *II* is more akin to the Second Circuit precedent applicable to the journalists' privilege for confidential materials, not undisputedly non-confidential materials like those at issue here. *See Shoen I*, 5 F.3d 1294 (considering the absence of confidential materials a factor to be weighed but within the same test).

the declaration of counsel on April 30, 2025.  Dkt. Nos. 12, 13.  On May 7, 2025, Williams filed

a reply memorandum of law in further support of the motion.  Dkt. No. 17.[5]

Williams seeks to enforce the Subpoena only with respect to the outtakes of Kim

Williams, the lawyers (Seymour, Wirskye, Shook, and Hebert), and the law enforcement officers

(Byrnes, Stewart, Kasper, Hillman, and Gibbs).  Dkt. No. 2 at 5.

## DISCUSSION

"It is settled law in this Circuit . . . that a journalist possesses a qualified privilege

protecting him or her from the compelled disclosure of even nonconfidential materials." *United

States v. Treacy*, 639 F.3d 32, 42 (2d Cir. 2011).  Where the information sought is not

confidential material or from a confidential source, the party seeking discovery may overcome

the qualified "journalist's' privilege" by showing "that the materials at issue are of likely

relevance to a significant issue in the case, and are not reasonably obtainable from other

available sources." *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 36 (2d Cir. 1999).  Whether the

materials sought are confidential or not, the Court is guided by the concerns animating the

journalist's' privilege:

> If the parties to any lawsuit were free to subpoena the press at will, it would likely
> become standard operating procedure for those litigating against an entity that had
> been the subject of press attention to sift through press files in search of information
> supporting their claims.  The resulting wholesale exposure of press files to litigant
> scrutiny would burden the press with heavy costs of subpoena compliance, and
> could otherwise impair its ability to perform its duties—particularly if potential
> sources were deterred from speaking to the press, or insisted on remaining
> anonymous, because of the likelihood that they would be sucked into litigation.
> Incentives would also arise for press entities to clean out files containing potentially
> valuable information lest they incur substantial costs in the event of future
> subpoenas.   And permitting litigants unrestricted,   court-enforced access to

---

[5] On May 27, 2025, NBCU filed a letter attaching supplemental authority in further support of its opposition to the motion to compel, namely, the recent decisions of the Central District of California relating to Williams's subpoenas to Warner Brothers for related footage.  Dkt. No. 18.

>    journalistic resources would risk the symbolic harm of making journalists appear
>    to be an investigative arm of the judicial system, the government, or private parties.

*Gonzales*, 194 F.3d at 35; *Lebowitz v. City of New York*, 948 F. Supp. 2d 392, 394 (S.D.N.Y.

2013) ("In the interest of protecting a vibrant free press from unwarranted intrusion, courts have

held that journalists possess a qualified privilege shielding certain information obtained in the

newsgathering process from discovery by litigants.").  The showing required to overcome the

qualified privilege "is the same in a criminal case as it is in a civil case [and] this is true whether

the party seeking to overcome the privilege is the prosecution or the defense." *Treacy*, 639 F.3d

at 43.

## I.    Applicability of the 'Journalists' Privilege

At the threshold, Williams argues: (1) that the materials requested are entitled to a lesser

protection under the 'journalists' privilege because they are "not the type of investigative work

product for which the qualified journalistic privilege was originally created" but rather "behind-

the-scene details for entertainment purposes of a trial that had received extensive news coverage

while it occurred," Dkt. No. 2 at 8–9; and (2) that the interests in disclosure are heightened in

this case because it is "inextricably intertwined with a criminal prosecution" and it implicates

Williams's death sentence, *id.* at 10.  Construed as arguments about the applicability of the

standard set forth in *Gonzales* for non-confidential materials, both are unavailing.

The journalist's' privilege is properly invoked "where the purpose to disseminate the

information motivated the gathering of the information," and is not properly invoked "where the

information was gathered for other reasons and the intent to publish arose only later." *Chevron

Corp. v. Berlinger*, 629 F.3d 297, 307 (2d Cir. 2011); *see also In re McCray, Richardson,

Santana, Wise, Salaam Litig.*, 991 F. Supp. 2d 464, 467 (S.D.N.Y. 2013).  The newsgatherer

must be acting in "the role of the independent press" when "collecting the information in

10

question" in order to invoke the privilege. *Chevron Corp.*, 629 F.3d at 307. By contrast, "[t]hose who gather and publish information because they have been commissioned to publish in order to serve the objectives of others who have a stake in the subject of the reporting are not acting as an independent press." *Id*. at 308. "[T]he individual claiming the privilege must demonstrate, through competent evidence, the intent to use material—sought, gathered or received—to disseminate information to the public and that such intent existed at the inception of the newsgathering process." *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987). However, the information may be gathered for dissemination to the public through any number of media. "[T]he press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *von Bulow*, 811 F.2d at 144 (quoting *Lovell v. Griffin,* 303 U.S. 444, 452 (1938)). "The intended manner of dissemination may be by newspaper, magazine, book, public or private broadcast medium, handbill or the like, for '[t]he press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.'" *Id*. (quoting *Lovell*, 303 U.S. at 452).

It is not disputed that the interviews here were conducted for dissemination to the public by members of the press and that those members of the press were independent. Indeed, the Second Circuit has repeatedly held that *Dateline* footage was protected by the qualified privilege. *See Gonzales*, 194 F.3d 29; *Krase v. Graco Children Prods., Inc.*, 79 F.3d 346, 348 (2d Cir. 1996) (applying New York law); *see also Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 757 F.3d 1125 (10th Cir. 2014).

Williams argues that the material sought here is not the product of "a novel investigation involving undercover reporting or exposing some sort of danger to the public" but rather material was created "for entertainment purposes of a trial that had received extensive news coverage."

Dkt. No. 2 at 8–9.  He attempts to distinguish earlier decisions relating to *Dateline* on the grounds that they broke news with original reporting.  *See, e.g., Gonzales*, 194 F.3d at 31 (*Dateline* producers gathered firsthand accounts and footage of unwarranted stop of motorists by law enforcement officers in Louisiana); *Krase*, 79 F.3d at 348 (*Dateline*'s "report about infant deaths that occurred in Graco Converta-Cradles" that "concluded with an admonition to 'keep an eye out for cradles that may have slipped by the 1992 recall'"); *Brokers' Choice*, 757 F.3d at 1131–32 (*Dateline* episode "exposing fraud in annuity sales to senior citizens" including surreptitiously filmed footage of seminar).  However, the journalist's' privilege is not limited to hard-hitting investigative pieces involving undercover reporting or breaking news.  In assessing the availability and strength of the privilege, the courts do not weigh the newsworthiness of the subject or the novelty of the reporting.  Rather, what matters is the intent to disseminate facts to the public through independent media.  *See von Bulow*, 811 F.2d at 144; *Chevron Corp.*, 629 F.3d at 307.

Courts in this Circuit have found the privilege applicable to numerous non-traditional, non-investigatory entities because those entities were gathering information with the intent to disseminate it to the public.  *See, e.g.*, *Schiller v. City of New York*, 245 F.R.D. 112, 119–120 (S.D.N.Y. 2007) (applying privilege to New York Civil Liberties Union questionnaires, designed to gather information to be published in NYCLU publications); *McCray*, 991 F. Supp. 2d at 754 (applying privilege to video and audio recordings made in connection with a documentary film); *NYC Medical Practice, P.C. v. Shokrian*, 2020 WL 13882100, at *4–*5 (E.D.N.Y. 2020) (applying privilege to Instagram account dedicated to publishing reviews and information about "various players in the plastic surgery industry").  There is no reason why the journalist's' privilege would not extend to the information that was gathered in connection with the *Dateline*

episodes at issue here, even if, as Williams contends, the episodes' primary purpose is entertainment. *Cf. Winters v. New York*, 333 U.S. 507, 510 (1948) ("The line between the informing and the entertaining is too elusive for the protection of that basic right [of press freedom] . . . What is one man's amusement, teaches another's doctrine."); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) ("The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform."). *Dateline* reported on a crime spree that allegedly terrorized an entire community.

Williams also argues that he has a greater right to the outtakes because he is seeking them in connection with his habeas petition and is on death row. Dkt. No. 2 at 10. As an argument about the proper standard to apply in considering Williams's discovery request, this too is unavailing.[6] The journalist's privilege applies in both civil and criminal cases. *See Treacy*, 639 F.3d at 43; *United States v. Burke*, 700 F.2d 70, 77 (2d Cir. 1983). It thus does not matter whether the information is sought to obtain or defend against a civil money judgment or to obtain or defend against a criminal conviction. The purpose of the privilege is to "protect the public's interest in being informed by a vigorous, aggressive and independent press." *Chevron Corp.*, 629 F.3d at 306 (emphasis omitted) (internal quotation marks omitted). That interest is equally implicated whether the information is being sought for civil or criminal purposes or, as here, in connection with a request for post-conviction relief against a death sentence. The nature of the case undoubtedly affects whether "the materials at issue are of likely relevance to a significant issue in the case," *Gonzales*, 194 F.3d at 36, but it does not affect the availability of the privilege

---

[6] Williams claims that his points relating to both the entertainment purposes of *Dateline* and the import of his habeas action were misconstrued by NBCU, and that neither were meant to suggest that the journalist's privilege would not be applicable—rather, he suggests that "the point is not that the privilege would not apply at all, but rather that because it entails balancing, the nature of the interests at stake—in this case, a human life—matters." Dkt. No. 17 at 4.

*vel non*.  For example, the Court would not allow the prosecution access to the outtakes for purposes of bringing a capital case absent the required showing.  It cannot compel their production to Williams in service of his post-conviction relief if *Williams* is unable to satisfy the *Gonzales* standards.

## II.    Entitlement to Outtakes Protected by 'Journalists' Privilege

The Court accordingly considers first whether the *Dateline* outtakes sought by Williams "are of likely relevance to a significant issue in the case," *Gonzales*, 194 F.3d at 36, and second, whether the information contained in the outtakes is "reasonably obtainable from other available sources."  *Id.*

### A.    Relevance to Habeas Case

Williams argues that the outtakes from the interviews of Kim Williams, the four attorneys, and the four law enforcement officers are all of likely relevance to significant issues in his Petition.  Dkt. No. 2 at 10–14.  NBCU argues that the request should be denied as constituting "nothing more than an impermissible fishing expedition" as Williams cannot specify what precisely he hopes to find in the materials sought nor how such material would be relevant to his specific habeas claims.  *Id.* at 11–13.[7]

The "standard for relevance to overcome the journalist privilege for non-confidential materials is low."  *Sokolow v. Palestine Liberation Org.,* 2012 WL 3871380, at *3 (S.D.N.Y. Sept. 6, 2012).  However, of the nine interview subjects, Williams succeeds in showing that the

---

[7] NBCU also argues that subpoenaed material cannot meet the relevance standard because all of it, except for the interviews with Kim Williams, was created before the "Vendetta" episode was broadcast in 2015, while Williams's criminal case was ongoing, predating Williams' state-court post-conviction proceedings and therefore inadmissible on federal habeas review.  Dkt. No. 12 at 10–11.  Because the Court finds that Williams has only articulated a basis for the relevance of the Kim Williams interview, the Court need not resolve the question whether interviews filmed prior to Williams's post-conviction proceedings are per se inadmissible and therefore per se irrelevant for the purposes of the journalist's' privilege.

outtakes are of likely relevance to a significant issue only with respect to the interview of Kim Williams.

Williams merely speculates as to the potential relevance of outtakes from the other eight interview subjects.  He argues generally that the requested footage is relevant because it "pertains to the murder investigation and trial that are the subject of the pending habeas petition," and "[t]hat alone makes it relevant to the claims in the habeas petition, several of which address the entire conduct of the investigation and trial."  Dkt. No. 2 at 11.  But that approach is the very definition of a "fishing expedition," which the journalist's' privilege prevents even as to non-confidential materials.  *See Pugh v. Avis Rent A Car Sys., Inc.*, 1997 WL 669876, at *5 (S.D.N.Y. Oct. 28, 1997) (recognizing that the privilege exists "to allow the press to publish freely on topics of public interest without harassment and scrutiny by litigants seeking to conduct 'fishing expeditions' into nonbroadcast materials in the hope that some relevant information may turn up"); *Sikelianos v. City of New York*, 2008 WL 2465120, at *1 (S.D.N.Y. June 18, 2008) (explaining that the privilege protects journalists from a party's "unfettered access to sift through journalists' files in search of information supporting his claims" (cleaned up)).  When it comes to specifics, Williams falls notably short.

He argues, for example, that the outtakes of the interviews with prosecutors Wirksye and Shook are relevant to Claim Two, the alleged *Brady* violation for producing a huge volume of discovery date in a "disorganized, unsearchable, and inaccessible format," Dkt. No. 2 at 4, because the prosecutors "were in charge of the information collected and generated throughout the case, including making required disclosures to the defense," *id.* at 12.  Williams points specifically to the portion of Wirskye's interview in which he "talks in detail about how the data-heavy portions of the investigation unfolded," arguing that "[t]he massive information generated

by the investigation of these many tips and the collection of so much video makes up a significant portion of the data that caused the problem at issue in Claim Two." *Id.* at 12. Williams suggests that the interview with FBI agent Hillman, in which Hillman "discusses the scale and scope of the investigation," also "bears on the volume and organization of information at issue in Claim Two." *Id*. at 14. But the fact that the investigation was extensive is not significant to Claim Two. What would be significant is the volume and accessibility of discovery material, the form in which it was produced, and the intent of the prosecutors in knowingly concealing exculpatory materials in a voluminous record. *See United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009) (noting that a *Brady* violation might arise if "the government 'padded' an open file with pointless or superfluous information to frustrate a defendant's review of the file," "[c]reat[ed] a voluminous file that is unduly onerous to access," or "hid[] *Brady* material of which it is actually aware in a huge open file in the hope that the defendant will never find it"). The aired portions of these interviews do not discuss the discovery process at all—nothing in the interviews suggests that the unaired portions would contain any disclosures relating to the prosecutors' intent or ability to produce the voluminous discovery in an accessible format.

Williams suggests that the outtake footage from Wirskye is also likely relevant to Claim Four, his claim that the prosecution failed to turn over evidence that the FBI had suspected a different car besides his of being the getaway car in the Hasse shooting, potentially suggestive of a third-party perpetrator. *See* Dkt. No. 3-1 at 56–57 ("At trial, the State argued that the vehicle used in the Hasse shooting was the silver 2001 Mercury Sable that Williams kept in a storage unit. . . however, the FBI had already determined that the car was most likely a white 2010-2013 Kia Forte EX or a white 2012-2013 Volkswagen Passata."). Williams suggests that Wirskye, in

his interview, discussed the hours of surveillance footage "which would have included video, ultimately processed and reviewed by the FBI, that gave rise to Claim Four." *Id*. at 12.  He asserts that in her aired interview, Stewart of the Kaufman County Sheriff's Office "explicitly discusses 'how many silver or light-colored four-door sedans there are,'" and while the FBI agents Hillman and Gibbs "do not directly address the car on camera, Hillman does discuss the FBI's significant involvement in the case, which is known to include attempting to identify the car used in the Hasse murder, in which the alleged Brady violation occurred." *Id.* at 14. However, neither the fact that there existed other silver or light-colored four-door sedans, nor that the FBI was trying to identify such a vehicle connected to the murders, appears to be at issue,.  What is disputed is whether the State had evidence that a four-door sedan other than that linked to Williams was linked to the murder.  There is nothing in the aired interviews that suggests that in the unaired portions, law enforcement revealed evidence of other vehicles not already included in what was turned over to the defense.

Williams argues that the interview outtakes from Kaufman County prosecutor Herbert are relevant to Claim Five, his claim that although the Kaufman County DA's office was disqualified from the case because of its close connection with the victims, a prosecutor from that office (Sue Korioth) remained intimately involved in the preparation of the case.  *See United States v. Lanier*, 879 F.3d 141, 151 (5th Cir. 2018) ("With respect to criminal matters, the Supreme Court 'establish[ed] a categorical rule against the appointment of an interested prosecutor, adherence to which requires no subtle calculations of judgment.'" (quoting *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 814 (1987)); *United States v. Anderson*, 93 F.4th 859, 869 (5th Cir.) ("A defendant is entitled to have a disinterested prosecutor." (internal citations omitted)), *cert. denied*, 145 S. Ct. 202 (2024).  He suggests that because

Hebert worked in the DA's office during the alleged events and spoke in the aired footage of the "the personal experience of the prosecutors in that office during the events at issue," Herbert's outtakes are relevant to propriety of Korioth's involvement in the prosecution even though he acknowledges that Herbert "did not, in the aired footage, discuss the actions of her colleagues in the office in preparation for the trial." *Id*. at 12. But there is no reason to believe that in the outtakes Herbert would have discussed Korioth and even less reason to believe that she would have discussed any involvement Korioth had with the prosecution. The interview of Herbert focused on the emotional impact on her of the deaths of her colleagues. It did not address Korioth or the role of any members of the Kaufman County DA's office in the prosecution.

Williams points to the interview outtakes of Seymour, his lead defense counsel, as relevant to Claims Six and Seven, his claims for ineffective assistance of counsel at the culpability and penalty phases of his trial. *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984) (holding that a defendant's right to counsel is violated if (1) his trial attorney's performance falls below "an objective standard of reasonableness" and (2) there is a "reasonable probability" that the result of the trial would have been different absent counsel's deficient acts or omissions). He argues that he is entitled to the Seymour footage because Seymour briefly "makes statements about what the defense strategy was," *id.* at 13, offering no additional information on what aspect of Seymour's performance was deficient or even what statements by Seymour about "defense strategy" suggest he was ineffective. In the only aired footage of Seymour, he states: "If I could break the chain from the live round recovered from the storage unit and the McLelland shooting scene, then I might stand a chance. Our position was, the State had not fulfilled their obligation to prove the elements of the indictment. It was just that simple." Dkt. No. 3-11 at 21. In his Petition, Williams's claim for ineffective assistance at the culpability

phase focuses on trial counsel's failure to have the case tried in a venue where Williams could get a fair trial; failure to "investigate and challenge the State's case" particularly with respect to ballistics, fingerprinting, and cell tower evidence; failure to object sufficiently to judicial bias during the trial; and decision to proceed to trial despite being unprepared, instead of withdrawing. His claims at the penalty phase relating to Seymour's efficacy concern Seymour's involvement or lack thereof in the mitigation investigation and presentation. Nothing in Seymour's statement itself, nor in an interviewer's question, nor in the cutting of the footage suggests that unaired footage from the same interview would go towards the question of whether Seymour's performance fell below an objective standard of reasonableness or would have shown "a reasonable probability that, but for counsel''s unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Williams suggests that the interview of Kasper, a Texas Ranger, is relevant to Claim Ten, which asserts flaws in the state's forensic evidence based on the unreliability of certain methods of fingerprint, ballistics, and DNA analysis. *See Gimenez v. Ochoa*, 821 F.3d 1136, 1143 (9th Cir. 2016) ("[T]he introduction of faulty evidence violates a petitioner's due process right to a fundamentally fair trial." (citing *Estelle v. McGuire*, 502 U.S. 62, 68–70 (1991)). He points to Kasper's discussion of the McLelland crime scene and the search of Williams's storage unit, suggesting that such discussion is relevant to flaws in the State's evidence "including fingerprints and ballistics/firearms evidence from the very areas Kasper is discussing." Dkt. No. 2 at 14; *see e.g.,* Dkt. No. 3-11 ("The front door was not kicked in, the door was unlocked, there's shell casings approximately four feet in. The shell casings are .223 caliber. . . The weapon used in this murder, you should've been able to hear it outside, no problem. . . He had rented a storage unit for Eric Williams. He was unsure what was in the storage unit, but he

believed that there may be something in there that we needed to know about.").  But on that theory, any discussion of a crime scene, no matter how general, would open the door to media outtakes on the grounds that if the interviewee discussed the crime scene he must also have discussed the collection of specific evidence from the crime scene and how that evidence was spoliated.  Williams draws no link between Kasper's statements, which are made at a high level of generality and do not, on their face, purport to say anything about the nature and quality of the expert forensic evidence that the State chose to put on at trial.  Accordingly, he identifies no specific flaw that Kasper discusses or presages which might be substantiated by unaired footage.

Williams's argument with respect to these eight interviewees is thus akin to that rejected in *McCray*: that simply because the witnesses were interviewed in a "relaxed, comfortable and trusting atmosphere," they are likely to have made admissions that would contain relevant material.  991 F. Supp. 2d at 470.  The court rejected that argument, finding that party seeking discovery "ma[de] only general claims that the outtakes are likely to contain relevant material" and failed to point to any "particular interview or outtake that would provide the evidence they seek."  *Id.*; *U.S v. Shah*, 2022 WL 1422252, at *2 (S.D.N.Y. May 5, 2022) (rejecting the relevance of requester's "broad categories of purported interest" where requester sought outtakes of interviews which "solicited information about [her] case, the circumstances surrounding [her] arrest, the agents' views on the case and background knowledge, and untold topics").  To grant Williams's request with respect to the interviews of the four law enforcement officers and four attorneys would, in effect, give him the right to "'sift through [journalists'] files in search of information supporting [his] claims,' [thereby] . . . undermin[ing] the public's perception of the press as an independent institution.'"  *Sikelianos*, 2008 WL 2465120, at *1 (quoting *Gonzales*, 194 F.3d at 35).

Williams's argument with respect to the outtakes of the interview with Kim Williams, however, stands on different footing. Whereas the aired portions of the interviews with other interviewees gave no indication that the outtakes of those interviews would contain information that is "likely relevant" to a significant issue embedded in Williams's claims, the aired interview with Kim Williams does. Claim Nine of Williams's Petition alleges that the State violated Williams's due process rights under *Brady* by failing to disclose material impeachment evidence pertaining to a key state penalty phase witness. *See United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule."). The core of Williams's claim is that the State of Texas made a deal with Kim Williams to secure her testimony against Williams in exchange for avoiding the death penalty but then denied the existence of such a deal both in the original trial and in subsequent post-conviction proceedings. Dkt. No. 3-1 at 162–64. Kim Williams herself testified on the stand that she did not have a deal with the State. *See* N.D. Tex. Proceeding Dkt. No. 118-18 at 8:25–9:5 ("Q: Are you guilty of these capital murders? A: Yes, I am. Q: Do we have any deal? A: No, we do not. Q: What have I asked you to do? A: To tell the truth.").[8] Williams argues that knowing Kim Williams "had been promised lesser punishment in exchange for her testimony would have been crucial information for a jury attempting to determine whether to believe her, and if they did not, there is a reasonable likelihood that the jury would have instead elected for life imprisonment." Dkt. No. 3-1 at 165. In addition to the purported deal, Williams also points

---

[8] *See also id.* at 93:1–93:17 ("Q: Do we have any deals? A: No, we do not. Q: Have we ever given you immunity? A: No. Q: You've always talked with us at your own peril? A: Yes. Q: Did I ever ask you to say anything other than the truth? A: No. Q: Obviously you have some expectation of leniency after this, this process is over with Eric, is that correct? A: Yes. I'm hoping for some consideration. Q: We have never talked about any specifics, have we? A: No, we have not. Q: I refused to talk with you and your lawyers about that, is that correct? A: Yes, that's correct.").

to impeachment evidence that the State allegedly withheld concerning Kim Williams's mental illness, drug use, and criminal history. *Id.* at 164. Kim Williams was the State's star witness at the penalty phase of the trial—her testimony regarding Williams's state of mind, his lack of remorse, and his delight in the execution of the triple homicide cannot have been other than central to the jury's decision to impose the death penalty. Accordingly, the withholding of impeachment evidence concerning Kim Williams is undoubtedly a "significant issue" within the meaning of *Gonzales*.

The discrepancies between Kim Williams's testimony on the stand and her statements in the *Dateline* interview, given the missing context for those statements and the logical relationship to follow-on questions, provide a sufficient basis to believe that the outtakes of the interview with her are "likely relevant" to the "significant issue" of whether impeachment evidence was withheld concerning Kim Williams, and whether that evidence was material. In her *Dateline* interview, Kim Williams states that the prosecutors instructed her not to cry on the stand. Dkt. No. 3-11 at 34. She also states that her drug use around the time of the murders caused her to act as a "zombie" and made her unable to "think straight." *Id.* Lastly, Kim Williams states that an important part of her testimony was "a mistake" and "not true." *Id.* at 36. On the stand during the penalty phase of Williams's trial, Kim Williams testified that she and Williams were both "happy" after the McLellands' murders and that they celebrated the killings by grilling steaks. *See* N.D. Tex. Proceeding Dkt. No. 118-18 at 69:7–69:10 ("Q: Were you all celebrating with steaks? A: That's correct. Q: What was the mood like at the cookout? A: Happy, joyous."). The prosecutors in their closing statement during the penalty phase harkened back to the steaks: "And he leaves the house, and they are happy. They have steak that night. He can eat. He can have a meal and enjoy himself." *Id.* at 154:21–154:23. In the *Dateline* interview,

22

she said that the grilling was "taken out of context": the McLellands were killed the day before

Easter Sunday, and Kim Williams's family has a tradition of grilling steaks every Easter.  Dkt.

No. 3-11 at 35.  The celebration was not of the murders.  And she states in the *Dateline* interview

that, contrary to her testimony on the stand, while Williams was "happy" after the murders, she

was "sick."  *Id.* at 35–36.

In this case, the only information that Williams has concerning the possible contents and

relevance of the *unaired* portions of Kim Williams's interview come from the *aired* portions of

the interview.[9]  Accordingly, the Court first examines the *aired* portions of the interview for their

potential significance to Williams's *Brady* claims.  Taken together, the *aired* portions of the

interview are relevant to Williams's *Brady* claim in two interrelated ways.

First, certain of Kim Williams's statements may be taken as indirect evidence of a deal

struck with the prosecution.  In her interview, Kim Williams suggests that parts of her testimony

were untrue or misleading.  As Williams argues, "[a] key witness backpedaling in this fashion is

indisputably relevant to a claim about how her testimony came to be."  Dkt. No. 12 at 38.  In

particular, Kim Williams's statements that her testimony regarding the steaks was "taken out of

context" and that her testimony about her own happiness after the murders was a "mistake" and

"not true" may support the notion that the State was able to mold and even distort her testimony

because of the deal that was purportedly struck.  This clears the "low bar" for "relevance to

overcome the journalist privilege for non-confidential materials."  *Sokolow,* 2012 WL 3871380,

at *3.

_____

[9] In other cases, the party requesting such outtakes might have other reasons to think that the
outtakes include relevant information, such as a witness who claims to have observed what was
said during a filmed interview but not included in the final cut.  No such evidence is offered here.

Second, Kim Williams's statements regarding her testimony may go to support the materiality of Williams's claimed *Brady* violation. To establish a *Brady* violation in the Fifth Circuit, "a defendant must show that (1) the prosecution suppressed evidence; (2) the evidence was favorable, such as exculpatory or impeachment evidence; and (3) the evidence was material." *Skilling*, 554 F.3d at 574. "Of the *Brady* components, materiality is generally the most difficult to prove. . . In assessing materiality, we must determine whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (internal citations and quotations omitted). In sum, "to show a due process violation when the state withholds evidence, a defendant need not prove that his trial necessarily would have had a different outcome; a lack of faith in the result is sufficient." *Id.* Kim Williams's statements may be relevant to the question whether the undisclosed deal, if it existed, impaired the jury's deliberations not simply because the jury was entitled to know about the deal when assessing her credibility but also because her statements could be taken to suggest that the State leveraged the deal to alter her presentation of testimony in a way that substantially changed the picture presented to the jury at the penalty phase. Such an alteration, if it occurred, could potentially give rise to a "lack of faith in the result" of the jury's election of the death penalty.

Williams has shown that the *aired* portions of Kim Williams's interview suggest that *unaired* portions of the interview are likely relevant to the above significant issues. The way in which the segments of the interview are cut together omits the interviewer's prompt in some instances, and in others cuts off what might be a logical follow-on question and answer. For example, when Kim Williams stated "that was taken out of context" in reference to the steaks, Dkt. No. 3-11 at 34, she is clearly responding to a question or prompt from the interviewer that

was not included in the aired footage but would aid in contextualizing her statement and understanding *who* took her story about the steaks out of context. On the reasonable assumption the interviewer would have asked whether Kim Williams told anyone that the celebration was not of the murders, the outtakes may shed light on whether the State had information that Kim Williams's testimony was false or at least inaccurate. Further, it is reasonably likely that an experienced journalist would have asked follow-up questions in response to Kim Williams's statements as to the portions of her testimony that were "not true" and a "mistake," questions which might have revealed additional discrepancies as well as information on how and why these omissions and discrepancies occurred. Kim Williams also tells the interviewer that the prosecutors "told me not to cry," but the aired footage cuts shortly after that statement, omitting any further exposition of why they told her not to cry or why she might have felt obliged to follow their directive. In short, it is substantially more than conjecture that the unaired portions of the interview could contain more exposition from Kim Williams. Such exposition could reasonably include why she gave the testimony that she did, if she knew that such testimony was untrue or misleading at the time, and whether there was any understanding or agreement between her and the State pursuant to which she gave her testimony.

Furthermore, the aired portion of the interview contains statements from both the interviewer and Kim Williams regarding Kim's mental health and substance use at the time of both the original crimes and her testimony. These portions of the interview are relevant to the portion of Claim Nine in which Williams claims that the State withheld impeachment evidence concerning Kim Williams, namely that the State knew that she had "a criminal case regarding stealing, or attempting to steal a baby, and the fact that while in jail awaiting trial, Mrs. Williams had been found in possession of illegal drugs." Dkt. No. 3-1 at 164. For example, the

interviewer asks Kim Williams "What has that done for you, being off of all those drugs?" *Id.*
She responds, "It's made me more clear-headed. My mind was very cloudy back then and I
couldn't think straight, and I was pretty much a zombie." *Id.* However, the aired footage does
not include Kim Williams's statements to the interviewer that would have preceded the question
about "all of those drugs"—what Kim Williams said about her drug use to begin with. There is
reason to believe that the interviewer would have asked, at least, what drugs Kim Williams was
taking ("all of those drugs") and from when Kim Williams was "off of all those drugs." Though
it was no secret during the trial that Kim Williams was a drug user, *see* N.D. Tex. Proceeding
Dkt. No. 118-18 at 92:19–92:21 ("Q: What type of person were you when you helped Eric
Williams commit these murders? A: A real bad druggy. I was a drug addict."), that does not
preclude Williams's claim that aspects of Kim's mental health, criminal activity, and drug use
may have been withheld by the prosecution.

Williams thus has shown that the outtakes of Kim Williams's interview are likely
relevant in a way that the requesting parties in *Krase* and *McCray* did not. In *Krase*, the Second
Circuit determined that the manufacturers of an allegedly defective cradle were not entitled to
outtakes from the *Dateline* interview with the mother of an infant who had allegedly died as a
result of the defective cradle. *See* 79 F.3d at 353. The Second Circuit applied the New York
Shield Law, not federal common law, and its decision predated *Gonzales*. *Id.* at 351. The court
asked whether the "the claim for which the information is to be used 'virtually rises or falls with
the admission or exclusion of the proffered evidence.'" *Id.* (quoting *United States v. Marcos*,
1990 WL 74521, at *3 (S.D.N.Y. June 1, 1990)). The manufacturers did not satisfy that
standard. Although they claimed that the mother in the outtakes likely spoke about the
positioning of her child in the cradle, there was no "basis" for that speculation. *Id.* at 352. As to

the remainder, the manufacturers' only claim was that the interviews would contradict the mother's deposition testimony and, even assuming that there were some inconsistencies between the interview and the deposition, "there [was] no basis for concluding that the out-takes would establish any further inconsistencies." *Id.*

In *McCray*, the City of New York sought outtakes from a documentary filmmaker's interviews with the Central Park Five,[10] who were then plaintiffs in a civil suit against the City. 991 F. Supp. 2d at 465. The City argued that "because the edited film contains contradictions in Plaintiffs' testimonies . . . Plaintiffs may have contradicted themselves in the outtakes as well." *Id.* at 470 n.2. The court rejected that argument both because the "edited version of the Film suffices as potential impeachment material" and because the requester could point to no specific interview in which the aired portion of the interview could give rise to an inference that the unaired portion contained relevant content. *Id.* at 470.

In both cases, the court had little difficulty reaching the conclusion that the outtakes were not discoverable. Not only were the requests based upon speculation, but they also admitted of few limiting principles. Few persons when asked to recount events in the past will recite them in exactly the same way, without "inconsistencies." *Krase*, 79 F.3d at 350. Thus, if it sufficed to pierce the privilege that an interview differed from sworn testimony in the respects identified by the requester in *Krase*, there would be little left of that privilege. In this case, by contrast, Williams's assertion that the Kim Williams outtakes would be relevant to his *Brady* claim is not based purely on speculation but rather on reasonable inferences from the questions Kim Williams was asked and the answers she gave and the way in which the footage was edited.

---

[10] The Central Park Five were five young men who were wrongfully convicted of the assault and rape of a jogger in Central Park in New York City in 1989. Their suit against the City was ultimately settled in 2014 for $41 million.

### B.    Reasonable Availability from Other Sources

Williams argues that the information sought is not otherwise available to him because he is not entitled to nor practically able to obtain unlimited discovery as an indigent criminal defendant, nor would depositions of the relevant interviewees adequately substitute for the outtake footage due to the qualitative value of the footage as evidence.  Dkt. No. 2 at 15–16.

Where a party seeks information that would reveal confidential sources, she must make "a clear and specific showing that the information is . . . and not obtainable from other available sources."  *In re Petroleum Products Antitrust Litigation*, 680 F.2d 5, 7 (2d Cir. 1982).  Courts have understood the "not obtainable" prong of the *Petroleum Products* test to require that the movant exhaust all other possible alternatives before seeking the materials at issue from the journalist in possession of them.  *See United States v. Burke*, 700, F.2d 70, 77 n.8 (2d Cir. 1983) (explaining that "not obtainable" prong imposes a "duty to exhaust all reasonable alternatives" as "*Petroleum Products* demands that effort").  By contrast, where, as here, "the protection of confidential sources is not involved," the privilege is "more easily overcome."  *Gonzales*, 194 F.3d at 36.  The requesting party need not show that the press is the only source for the information but that the information is "not reasonably obtainable from other available sources."  *Id.*  Whether the information is "reasonably obtainable from other available sources" is necessarily a context-specific inquiry that will turn not just on whether the requested information may be obtained through other means but on the burdens placed on the requesting party in using those other means.  *See Schiller*, 245 F.R.D. at 120 (finding information sought "not reasonably obtainable" where "[e]quivalent information could be obtained only by subpoenaing and deposing the hundreds of nonparty witnesses who filled out the questionnaires").[11]

---

[11] NBCU cites to other decisions from this District in which courts have expressly or tacitly

NBCU is correct that, generally speaking, "the most obvious alternative sources of information are the interview subjects themselves." Dkt. No. 12 at 17; *see Krase*, 79 F.3d at 353 ("Ms. Marden clearly was available to answer questions about the circumstances surrounding her son's death, his position in the Converta–Cradle, and his physical condition before he died."); *McCray*, 991 F. Supp. 2d at 471 ("[T]here is no case law supporting Defendants' allegation that information is not 'reasonably obtainable elsewhere' when Plaintiffs in the case are available for deposition."); *Lebowitz*, 948 F. Supp. 2d at 395 (finding failure to show that "information sought is not reasonably obtainable" where there were "at least three other witnesses" that "may have observed the events in question," but "the City ha[d] not subpoenaed them"). NBCU is also correct that the privilege may not be overcome simply by asserting that a media interview conducted in a "relaxed, comfortable and trusting atmosphere," *McCray*, 991 F. Supp. 2d at 470, is more likely to yield usable information than a deposition conducted in an adversarial proceeding. Aside from its dubious premise that a reporter is always more skillful in eliciting admissions than a skillful litigator, the proposition proves too much. It would render the 'journalists' privilege illusory with respect to significant information, at least that uncovered by a skilled reporter. *See Lebowitz*, 948 F. Supp. 2d at 395 ("[M]erely because a party believes that a journalist is a disinterested witness does not render other witnesses 'unavailable.'"); *McCray*,

---

imposed an exhaustion requirement. *See, e.g., Application of Behar*, 779 F. Supp. 273, 275 (S.D.N.Y. 1991) ("Before a reporter's resources can be tapped by subpoena, the party seeking the information must demonstrate that other available sources of the information have been exhausted."); *In re McCray, Richardson, Santana, Wise, & Salaam Litig.,* 928 F. Supp. 2d 748, 758 (S.D.N.Y.) ("Establishing unavailability will require a showing that Defendants attempted to obtain the information from another source, or cannot obtain the information from another source."), *aff'd sub nom. In re McCray, Richardson, Santana, Wise, Salaam Litig.*, 991 F. Supp. 2d 464 (S.D.N.Y. 2013). However, both decisions apply the pre-*Gonzales* standard of unobtainability, and are therefore inapplicable on this point. The decision of the district court in *McCray* noted that the magistrate judge had inaptly relied on *In re Petroleum* and its progeny, *see McCray*, 991 F. Supp. 2d at 469 n.1.

991 F. Supp. 2d at 471 ("Defendants point to no case law that supports their contention that, in the context of discovery proceedings, the existence of a video interview in a 'relaxed' setting will overcome the *Gonzales* test for reporter's privilege when the same witnesses are available for a deposition in a less 'relaxed' setting."). Allowing the journalists' privilege to be routinely overcome in such circumstances would risk it "becom[ing] standard operating procedure for" defendants in criminal cases "that had been the subject of press attention to sift through press files in search of information supporting their claims." *Gonzales*, 194 F.3d at 35.

However, Williams has identified several factors in this case that, when considered in combination, make it unreasonable to assert simply that he could get the same information from deposing Kim Williams that he would get from receiving the outtakes. First, given the unique facts of this case, there is an unusually high probability that Kim Williams's testimony in a deposition with Williams's counsel would not yield the same information as her *Dateline* interview. *Cf. Lebowitz*, 948 F. Supp. 2d at 395 ("[C]redibility concerns could theoretically render non-journalist witnesses 'unavailable' in an extreme case."). The Court cannot put aside the fact that Kim Williams is the former wife of Williams who, on her own account, was induced to engage in a conspiracy to kill three people and to commit capital murder. As a result of that manipulation, three people died. Also as a result of that manipulation, she faced charges that could have resulted in her execution. And it is undoubtedly a result of her testimony that she avoided exposure to the death penalty, whether by prior agreement or by the after-the-fact exercise of prosecutorial discretion. The pressure faced by the condemner when forced to confront the condemned takes this case well outside of the context of the ordinary civil or criminal case where a deposition by counsel can serve as a substitute for an interview conducted by the media. That conclusion is only reinforced by the relief sought by Williams in this case:

that his death sentence be vacated and he—the person whose conduct could have resulted in Kim

Williams's own death—be permitted to live.  In such circumstances, Williams's concern about

the reliability of deposition as an alternative for Kim Williams's evidence is eminently

reasonable.

Second, if Williams seeks to depose Kim Williams regarding the possibility that she lied

on the stand, under oath, she would be entitled to invoke her Fifth Amendment privilege against

self-incrimination, even if other barriers to her deposition could be overcome.  *See Treacy*, 639

F.3d at 43 ("Because Treacy possessed an absolute Fifth Amendment right not to testify himself,

[the journalist] was the only potential witness who could confirm that Treacy had made the

statements quoted in the article, satisfying the requirement that the material be 'not reasonably

obtainable from other sources.'"); *United States v. Cutler*, 6 F.3d 67, 73 (2d Cir. 1993) ("Other

than Cutler's own testimony, which of course cannot be compelled, the evidence that Cutler

seeks from the Reporters and the TV Stations is probably the only significant proof regarding his

assertedly criminal behavior.  Further, even if Cutler should choose to testify, we see no

justification for consigning him to his unassisted memory when clearly relevant evidence is

readily available from the Reporters and TV Stations.").[12]  Kim Williams testified under oath

---

[12] Drawing on a related area of law, it is well established that attorney work product protection
may be overcome for fact work product where "the alternative of taking a deposition could not
provide substantially equivalent information" to the requested material "if the witness refuses to
testify on a valid ground, such as the Fifth Amendment."  8 Wright & Miller's Federal Practice
& Procedure § 2025 (3d ed. 2025); *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d
521, 533 (S.D.N.Y. 2015) (denying request for work product-protected materials "without
prejudice to any future application . . . for particular materials in the event that a witness . . .
proves to be unavailable for deposition as a result of death, invocation of the Fifth Amendment
privilege against self-incrimination, or otherwise.").  Though relevant work product cases have
mostly found the protection overcome where the proposed deponent has already invoked the
Fifth Amendment, it stands to reason that the threshold would be higher where such protection
can only be overcome by a showing that the party "cannot, without undue hardship, obtain their

multiple times during the penalty phase that she did not have any kind of deal with the State. *See e.g.,* N.D. Tex. Proceeding Dkt. No. 118-18 93:1–93:6 ("Q: Do we have any deals? A: No, we do not. Q: Have we ever given you immunity? A: No. Q: You've always talked with us at your own peril? A: Yes.). If the central question at deposition is whether or not Kim Williams had a deal with the State to avoid the death penalty, the answer to that question would directly implicate her guilt or innocence of perjury. Moreover, she would be implicated in a case undoubtedly closely scrutinized by the State of Texas, where the fear of prosecution would be more than speculative.

Accordingly, Williams has adequately established that the outtakes from the interview with Kim Williams are not reasonably obtainable from other sources, and such outtakes must be produced by NBCU.

## III.    Undue Burden

NBCU argues that the production of outtakes from the nine interviews sought by Williams would subject NBCU to undue burden. Dkt. No. 12 at 20–24. NBCU provides evidence that the total raw footage for all nine interviews is 12.4 hours, "digitally archived across at least 27 separate files, with several of the interviews broken up across multiple files." *Id.* at 21. It estimates that the combined labor hours it would take to prepare, upload, and review for privilege and other sensitive information would require "*a minimum* of 30 hours." *Id.* at 22 (emphasis in the original). NBCU does not provide a breakdown of those hours by interview subject. The Court is not moved by a burden of thirty hours, and still less so by the unspecified fraction of such time and resources that will be required to prepare and share only the Kim Williams footage. As Williams points out, NBCU has found time to repackage and re-air the "Vendetta" materials twice since it originally aired in 2015—first in 2023 with the added Kim

---

substantial equivalent," Fed. R. Civ. P 26(b)(3)(A)(ii), whereas the *Gonzales* standard requires only that the material not be "reasonably obtainable from other sources," 194 F.3d at 36.

Williams footage, and again in 2024 for its new "The Smoking Gun" *Dateline* spinoff.  Dkt. No.

2 at 4–5, 17.  The latter was released roughly eleven months after NBCU originally received the

subpoena at issue.  The Court rejects NBCU's argument as to burden for the production of the

Kim Williams footage.

## CONCLUSION

The motion to compel compliance with the subpoena issued to NBCU is GRANTED IN

PART and DENIED IN PART.  In particular, the motion is GRANTED with respect to the

outtakes of the interview of Kim Williams.

The Clerk of Court is respectfully directed to close the case.


SO ORDERED.

Dated: August 25, 2025
       New York, New York        _____
                                          LEWIS J. LIMAN
                                   United States District Judge